UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION @ CINCINNATI

ANDREW MITCHELL and   :
DAVID SCHOFIELD,       :
                       :
        Plaintiffs,    :
                       :   Case No.
vs.                    :   1:21-CV-00626-MRB
                       :
CITY OF CINCINNATI     :
and MAYOR JOHN         :
CRANLEY,               :
                       :
        Defendants.    :


    Deposition of LT. COL. THERESA THEETGE, a

witness herein, taken by the plaintiffs as

upon cross-examination, pursuant to the

Federal Rules of Civil Procedure and pursuant

to notice of counsel as to the time and place

and stipulations hereinafter set forth, at

the offices of Mr. Hicks, Senior Assistant

City Solicitor, City of Cincinnati Law

Department, 801 Plum Street, Suite 214,

Cincinnati, Ohio, at 2:04 p.m., Wednesday,

October 20, 2021, before Deanne Cartwright, a

Court Reporter and Notary Public, within and

for the State of Ohio.

                                - - -

```
 1                    APPEARANCES

 2

 3    FOR THE PLAINTIFFS:    ZACHARY GOTTESMAN, ESQ.
                             Gottesman and Associates
 4                           404 East 12th Street
                             First Floor
 5                           Cincinnati, Ohio 45202

 6    FOR THE PLAINTIFFS:    ROBERT J. THUMANN, ESQ.
                             Crehan & Thumann
 7                           404 East 12th Street
                             Second Floor
 8                           Cincinnati, Ohio 45202

 9    FOR THE PLAINTIFFS:    CHRISTOPHER WIEST, ESQ.
                             Attorney at Law
10                           25 Town Center Boulevard
                             Suite 104
11                           Crestview Hills, KY 41017

12    FOR THE INTERVENOR:    DONYETTA D. BAILEY, ESQ.
                             Bailey Law Office, LLC
13                           312 Walnut Street
                             1600 Scripps Center
14                           Cincinnati, Ohio 45202

15    FOR THE DEFENDANTS:    WILLIAM C. HICKS, ESQ.
                             Sr. Assistant City
16                           Solicitor
                             City of Cincinnati Law
17                           801 Plum Street
                             Suite 214
18                           Cincinnati, Ohio 45202

19

20

21

22

23

24

25
```

3

1          S T I P U L A T I O N S

2      It is stipulated by counsel for the

3  respective parties that the deposition of

4  LT. COL. THERESA THEETGE, a witness herein,

5  may be taken at this time by the plaintiffs

6  as upon cross-examination and pursuant to the

7  Federal Rules of Civil Procedure and notice

8  to take deposition, under notice all other

9  legal formalities being waived by agreement;

10  that the deposition may be taken in stenotype

11  by the Notary Public-Court Reporter and

12  transcribed by her out of the presence of the

13  witness; that the transcribed deposition was

14  submitted to the witness for examination and

15  signature and that signature may be affixed

16  out of the presence of the Notary

17  Public-Court Reporter.

18

19

20

21

22

23

24

25

4

```
 1                      INDEX

 2   WITNESS          DIRECT  CROSS  RE-       RE-
                                     DIRECT    CROSS
 3

 4   LT. COL. THERESA THEETGE
     BY MR. GOTTESMAN:          5              79
 5   BY MS. BAILEY:     69                     81

 6   EXHIBIT IDENTIFIED                        PAGE

 7   Exhibit 5                                 28
     Exhibit 6                                 28
 8   Exhibit 7                                 32

 9   EXHIBIT REFERENCED                        PAGE

10   Exhibit 1                                 10
     Exhibit 2                                 23
11   Exhibit 3                                 57
     Exhibit 4                                 65
12
     OBJECTIONS                       PAGELINE
13
     MR. HICKS:                       7      21
14   MR. HICKS:                       45     21
     MS. BAILEY:                      47     13
15   MS. BAILEY:                      49     15
     MS. BAILEY:                      49     18
16   MS. BAILEY:                      50     15
     MS. BAILEY:                      51      3
17

18

19

20                                              01:37

21

22

23

24

25
```

```
 1              LT. COL. THERESA THEETGE,
 2        a witness herein, of lawful age, having
 3   been first duly sworn as hereinafter
 4   certified, was examined and testified as
 5   follows:
 6                THE WITNESS:  I do.
 7                 CROSS-EXAMINATION
 8   BY MR. GOTTESMAN:
 9        Q.    Colonel Theetge, my name is Zach
10   Gottesman.  I'm plaintiff's counsel in this      02:03
11   case.  I represent Lieutenants Mitchell and
12   Schofield in a lawsuit they filed to
13   challenge the continued use of the State
14   Court 1987 Consent Decree effecting
15   promotions of lieutenants and captains.  Are
16   you familiar with that consent decree?
17        A.    Yes.
18        Q.    Are you familiar with that
19   lawsuit?
20        A.    Yes.                                   02:03
21        Q.    You have been identified as a
22   witness and will be giving testimony at a
23   hearing before the court on, excuse me,
24   October 27th.  Did you know you'd been
25   identified as a witness?
```

A. Yes.
Q. What is it that you understand you would be testifying in regards to that hearing?
A. I think it's just the -- some of the processes within the police department as they relate to the consent decree and just -- personnel section is in my bureau --
Q. Okay.
A. -- so some of the processes for promotion. 02:03
Q. So currently you're -- you hold the rank of lieutenant colonel?
A. I'm the executive assistant chief.
Q. Okay.
A. Uh-huh.
Q. And that is -- how many other CPD personnel hold that rank?
A. Just me. 02:04
Q. Okay. So other than Chief Isaac, you're the next highest police personnel?
A. Correct.
Q. And part of what you oversee in

1    your job responsibilities is personnel which

2    includes promotions and hiring?

3         A.    Correct.

4         Q.    All right.  So when -- when you

5    say you would be testifying about the

6    processes, are you talking specifically about

7    implementation of the state court consent

8    decree promotions in this case particularly

9    of lieutenants -- sergeants to lieutenants

10   and lieutenants to captains?                          02:04

11        A.    That's what I believe.

12        Q.    Okay.  That's what -- that's

13   what you anticipate testifying to on the

14   27th?

15        A.    Correct.

16        Q.    Okay.  Very good.  Let's start

17   at the basics and that is:  Are you -- when I

18   use -- what is your understanding of the

19   classified civil service as that term is

20   defined in our Ohio Revised Code?                     02:05

21             MR. HICKS:  Just objection for

22   the record.  Calls for a legal conclusion.

23   Go ahead.

24        A.    So classified it's -- you have

25   classified and you have unrepresented.

1    Sometimes I think people use those -- they

2    interchange those.  Classified is they are,

3    in escence, not a nationwide search.  They

4    are positions from within and in this case

5    represented by the Fraternal Order of Police.

6         Q.    Okay.  Specifically in regards

7    to the police, the classified civil service,

8    as I understand it, is the hiring and

9    promotion of police officers, police

10   sergeants, police lieutenants, and police          02:05

11   captains.

12        A.    Correct.

13        Q.    So those four ranks:  Officer,

14   sergeant, lieutenant, and captain all fall

15   within the classified civil service.

16        A.    Correct.

17        Q.    And you understand that to be a

18   function of the Ohio Revised Code?

19        A.    I'm uncertain.

20        Q.    You don't know the --                    02:06

21        A.    Yeah.

22        Q.    -- source for it.

23        A.    I don't know that.

24        Q.    Okay.  Fair enough.

25        A.    Okay.

9

```
 1        Q.    And this is not a test.  I just
 2  want to know what --
 3        A.    I get it.
 4        Q.    -- if sworn in under oath what
 5  you would say if asked.
 6        A.    Uh-huh.
 7        Q.    Do you also further understand
 8  that hiring and promotion within those
 9  classified civil service ranks is to be done
10  by competitive exam in accordance with state
11  law?
12        A.    Correct.
13        Q.    And do you understand that that
14  competitive exam process is a race neutral
15  process?
16        A.    Correct.
17        Q.    Okay.  Great.  Now, in the City
18  of Cincinnati, the city for the promotion of
19  lieutenants and captains does not follow a
20  strict race-based approach to promotion --
21  I'm sorry.  Not race based.  A test-based
22  approach to the promotion of lieutenants and
23  captains.  Do you agree?
24        A.    Ask that again.  I'm uncertain
25  what you're trying to ask.
```

02:06 (line 10)
02:06 (line 20)

1    Q.    So within the City of Cincinnati

2  Police Department, promotion to -- from

3  sergeant to lieutenant and lieutenant to

4  captain isn't solely based on competitive

5  testing; is that true?

6    A.    The list is garnered solely on

7  testing.

8    Q.    But the promotions are not.  Do

9  you agree?

10    A.    The promotions go down the list          02:07

11  until we have a promotion that may be

12  affected by the consent decree.

13    Q.    Right.  So that's what I'm

14  getting at is the consent decree is used by

15  the City of Cincinnati to deviate from the

16  statutory requirements of classified civil

17  service promotion methods.

18    A.    I don't believe that's

19  100 percent accurate.

20    Q.    Okay.  Let me -- we'll cut back          02:07

21  to it.

22    A.    Okay.

23    (Exhibit 1 was referenced.)

24    Q.    And we'll get right to the state

25  court consent decree.  In front of you prior

1  to the deposition, I think you still have it,

2  you've got an exhibit what's been marked for

3  identification as Exhibit 1.  Do you

4  recognize that as the state court consent

5  decree entered September 14, 1987 that

6  pertains to the promotion of lieutenants and

7  captains within the Cincinnati Police

8  Department?

9          A.    I believe that's what it is.

10         Q.    And as someone who's involved          02:08

11  and familiar with the promotions and

12  personnel hiring and promotion within the

13  Cincinnati Police Department, you're familiar

14  with how that's implemented, correct?

15         A.    Correct.

16         Q.    And the -- look if you would,

17  please, at exhibit --

18         A.    None of these other ones are

19  marked just so you know that.

20         Q.    They should be.  That one is.

21  Two.  Bottom on the right.

22         A.    Oh, okay.  I'm sorry.  At the

23  bottom.  Yes.  I see it now.

24         Q.    So Exhibit 2 --

25         A.    Uh-huh.

1      Q.    -- is the promotional

2  eligibility list currently in effect for the

3  rank of captain; is that right?

4      A.    Correct.

5      Q.    And you were -- as we were

6  discussing it -- let me just go on.  The way

7  that list works, we are currently -- we

8  promoted the first three applicants on that

9  list.

10      A.    Correct.               02:09

11      Q.    And there is now an opening by

12  virtue of the retirement of Captain Paul

13  Broxterman.

14      A.    Correct.

15      Q.    And the way it set up to work if

16  the state court consent decree is continued

17  to be implemented, upon the promotion of

18  Lieutenant Richardson to the rank of captain,

19  there will also be another captain -- another

20  lieutenant promoted to captain and that would    02:09

21  be Lieutenant Brian Norris --

22      A.    Correct.

23      Q.    -- right?

24      A.    Uh-huh.

25      Q.    Brian Norris is currently

1 seventh on the promotional eligibility

2 list --

3          A.    Correct.

4          Q.    -- and the next person on the

5 list after Lieutenant Richardson is

6 Lieutenant Andrew Mitchell?

7          A.    Correct.

8          Q.    And then after Lieutenant Andrew

9 Mitchell is Lieutenant David Schofield.

10          A.    Correct.                                02:10

11          Q.    And the reason that you would be

12 promoting -- the Cincinnati Police Department

13 would be promoting Lieutenant Brian Norris is

14 because under the state court consent decree

15 if you promote four white males in a row you

16 go down the list and you find the first

17 female or minority candidate and promote them

18 with that fourth white male.

19          A.    Yes.  Except your explanation of

20 four in a row.  It's a little deeper than        02:10

21 that.  You group the list in groupings of

22 four and then you bring one up.

23          Q.    I see.

24          A.    So you could have number two,

25 three, four, and five be male whites.  That's

1    four in a row.  But if number one was not a

2    male white, that would not bring somebody

3    else up.  So it's not just a random four.

4    It's groupings:  Number one through four,

5    five through eight, nine through 12.  That's

6    how the four -- group of four is broken down.

7           Q.    I see.  Thank you for that.

8           A.    Uh-huh.

9           Q.    And as -- you said to me at the

10   outset that you have not read through state          02:11

11   court -- the state court consent decree.

12   You've never read it?

13          A.    Right.

14          Q.    But you are charged with

15   implementation of it?

16          A.    Correct.

17          Q.    Is that grouping practice that

18   you just described for me contained in

19   Exhibit 1?

20          A.    Like I said, I've not read this      02:11

21   so I'm not certain to that fact.  What I do

22   know is based on conversations with city HR

23   and Mr. Steve Lazarus, that is the way it was

24   explained to me --

25          Q.    Okay.

1        A.      -- the way that that is

2    implemented.

3        Q.      All right.  And so its

4    implementation -- as you implement it, it is

5    based on conversations with HR and

6    conversations with FOP counsel Steve Lazarus?

7        A.      Correct.

8        Q.      Do you agree with me then that

9    the race -- that the promotion policy, as you

10   just described it as implemented from the          02:12

11   state court consent decree, is not race

12   neutral?

13       A.      The implementation of it is not

14   race neutral?  I guess I would agree with

15   that but I think your statement earlier was

16   the testing race neutral --

17       Q.      Well --

18       A.      -- and the -- the determination,

19   I guess I could say -- I'm sorry.  I forget

20   what your wording was -- as the list is          02:12

21   compiled.

22       Q.      That's race neutral --

23       A.      Yes.

24       Q.      -- right?  The grading and

25   organization --

1       A.      Yes.

2       Q.      -- where candidates fall on the

3  list, that is not a racially --

4       A.      Correct.

5       Q.      -- driven process.

6       A.      Correct.

7       Q.      You get a number based on your

8  test and that's where you line up, right?

9       A.      And your seniority.

10       Q.      Right.  Fair enough.  Now, the        02:13

11  consent decree also will allow for a double

12  fill I think is the term --

13       A.      Uh-huh.

14       Q.      -- if the -- instead of a black

15  officer it's a female officer.

16       A.      So under the example that you

17  just gave with Captain Broxterman retiring --

18       Q.      Yes.

19       A.      -- yes, there is the potential

20  that a female, black or white, could also be        02:13

21  the double fill in lieu of a male black in

22  this example.

23       Q.      So the consent decree as

24  implemented for the -- by the police

25  department can benefit a black officer or a

1    female officer but it would never work to the

2    benefit of a white male officer.  Do you

3    agree?

4         A.    Correct.

5         Q.    All right.  How many captains

6    are there?

7         A.    Fifteen.

8         Q.    And that compliment is -- is

9    it -- the current compliment is 15, correct?

10        A.    Uh-huh.                              02:14

11        Q.    Please use yes or no for the --

12        A.    Yes.

13        Q.    -- court reporter.

14        A.    Yes.

15        Q.    And then is that how many

16   captains we have currently?

17        A.    With Captain Broxterman retiring

18   effective last Saturday, we are now at 14.

19        Q.    And if you promoted two then you

20   agree with me the number would go up to 16?    02:14

21        A.    Correct.

22        Q.    How often do captain promotions

23   happen?

24        A.    Less frequent than sergeants or

25   lieutenants for sure and then it's upon

18

1    retirement.  So we usually have maybe one or

2    two on average every year that retire.

3    Sometimes more.  Sometimes less.

4          Q.    All right.  How many assistant

5    chiefs are there?

6          A.    Currently three.

7          Q.    And what is that compliment?

8          A.    Currently five.

9          Q.    So if there's two openings right

10   there at that rank, do you know why those are          02:15

11   going unfilled?

12         A.    No, I do not.

13         Q.    Is there any -- those are not

14   within the classified civil service.  Do you

15   agree?

16         A.    Correct.  They're unclassified.

17         Q.    And is there any reason that

18   you're aware of why they should not be

19   filled?

20         A.    I believe it's because currently        02:15

21   we are operating sufficiently with three.

22         Q.    Okay.  One of the stated goals

23   of this consent decree marked as Exhibit 1 is

24   to increase or provide certainly the

25   opportunity to increase diversity including

1    female and black officers in the upper ranks,

2    right?

3          A.    Correct.

4          Q.    That's your understanding of why

5    it's implemented, right?

6          A.    In all ranks not just the upper

7    ranks --

8          Q.    Well, this one only --

9          A.    This one, correct --

10         Q.    -- applies to --                        02:15

11         A.    -- lieutenants and captains.

12         Q.    -- lieutenants --

13               THE REPORTER:  One at a time.

14               THE WITNESS:  Sorry.

15               MR. GOTTESMAN:  Sorry.  I

16    gotcha.  We're making a mess.

17         Q.    But there's nothing stopping the

18    chief right now from recommending the

19    appointment of two new assistant chiefs as

20    far as you're aware?                              02:16

21         A.    As far as I'm aware.  I'm un --

22    I'm uncertain that there's anything that's

23    stopping that right now.

24         Q.    Walk me through your progression

25    from recruit:  How many times have you tested

1   for the various promotions and when did you

2   ultimately succeed in attaining those

3   promotions?  If you can.

4          A.     Yeah.  So I was hired in 1990.

5   Few years into that, maybe four or five

6   years, I got promoted to police specialist

7   which is now no longer in existence for

8   testing purposes.  In '99 I got promoted to

9   sergeant.  I cannot recall if I made it on my

10  first try or if I took two tries at that          02:17

11  rank.  I do not recall that.  I think it was

12  just one.

13         And then it was in '04 or '05 --

14  it was '04 I got promoted to lieutenant.

15  That one I do recall testing twice.  Did not

16  get promoted at the first attempt.  Got

17  promoted at the second attempt.  And then in

18  2007 got promoted to captain at my first

19  attempt and in 2016 got promoted to assistant

20  chief at my first attempt at applying.  That     02:17

21  was not a testing process but my first

22  attempt of applying for that position.

23         Q.     And that was under Chief Eliot

24  Isaac?

25         A.     Yes.  Yes.

1          Q.      And so he's the one who

2    recommended you for the position and the city

3    manager appointed?

4          A.      Correct.

5          Q.      I understand.  At any point in

6    that evolution that you just described for

7    me, were you the beneficiary of a double-fill

8    opportunity?

9          A.      Yes.  The rank from sergeant to

10   lieutenant.                                              02:18

11         Q.      So when you made lieutenant, you

12   went up with someone else --

13         A.      Correct.

14         Q.      -- by virtue of the state court

15   consent decree we're discussing right now?

16         A.      Correct.

17         Q.      And you're familiar, aren't you,

18   with the other federal consent decree that

19   was enacted in 1980, the subject -- that was

20   recently overturned by Judge Dlott?                      02:18

21         A.      Correct.  For the sergeant's

22   rank.

23         Q.      Okay.  You did not receive

24   beneficial treatment under that at any

25   point --

1         A.      Not to my --

2         Q.      -- or as a new hire or as

3   sergeant?

4         A.      Not to my recollection, no. I

5   think it was only the lieutenant.

6         Q.      Who were you -- who was the

7   other sergeant promoted with you to the rank

8   of lieutenant?  Do you recall?

9         A.      So the fourth male white that

10  would --                                          02:18

11        Q.      Yes.

12        A.      -- have brought me up?  Jim

13  Gramke.

14        Q.      Gramke.

15        A.      Uh-huh.

16        Q.      And who was the -- was it a

17  retirement or some other -- what created the

18  opening?  Do you recall?

19        A.      We were not at the top of the

20  list if I remember right.  We were a little     02:19

21  down so it had to have been a retirement,

22  resignation, something like that.  There

23  was -- at that time we used to have a

24  lieutenant's position that was in charge of

25  kind of coordinating our Cincinnati

1    Metropolitan Housing relationships.  That
2    lieutenant's position -- so this is a little
3    more than what your question asked so I hope
4    you're okay with this.  I just wanted you to
5    be aware.
6              So we -- Jim Gramke and I were
7    sworn in and I was brought up as an overfill
8    for that.  Then that particular lieutenant's
9    position was no longer funded so it was
10   abolished, so we were demoted together and          02:19
11   then at a later date when there was a vacancy
12   again promoted together.
13             MS. BAILEY:  Wow.
14        A.   Because -- simply because a
15   position was abolished.
16        Q.   That is confusing.
17        A.   Yeah.
18   (Exhibit 2 was referenced.)
19        Q.   I'm gonna let that go.  So look
20   at what I marked for identification as              02:20
21   Exhibit 2.
22        A.   Uh-huh.
23        Q.   It's the promotion list.
24        A.   Yep.
25        Q.   David Johnston, Adam Hennie, and

1    Stephen Saunders are also male white,

2    correct?

3          A.    Correct.

4          Q.    And then Joe Richardson's a male

5    white?

6          A.    Correct.

7          Q.    And that's why that would be the

8    triggering event to bring up Brian Norris --

9          A.    Correct.

10         Q.    -- who is a male black?                  02:20

11         A.    Correct.

12         Q.    And Norris would be promoted

13   ahead of Andy Mitchell -- Lieutenant Mitchell

14   and Lieutenant Schofield even though both

15   Lieutenant Mitchell and Lieutenant Schofield

16   scored higher on the promotional eligibility

17   test.

18         A.    Correct.

19         Q.    And by virtue of that promotion,

20   there would be roughly a 16 percent increase    02:20

21   in pay for Lieutenant Brian Norris?

22         A.    Correct.

23         Q.    He would also have other

24   benefits of employment that come with the

25   increased rank.

1          A.      Such as?

2          Q.      The command responsibilities.

3    He becomes a member of command staff, right?

4          A.      Correct.

5          Q.      Lieutenant Mitchell and

6    Lieutenant Schofield would not be members of

7    command staff --

8          A.      Correct.

9          Q.      -- right?  He has input into

10   policy development and implementation as a          02:21

11   member of command staff?

12         A.      Implementation, yes.  Policy

13   development, not necessarily.

14         Q.      Well, policy is discussed and

15   developed at the command staff meetings,

16   right?

17         A.      Sometimes.  Not always.

18         Q.      And the chief does allow for

19   input from the members of the command staff

20   to weigh in on various issues.                      02:21

21         A.      Correct.

22         Q.      That would be an opportunity not

23   given to Lieutenant Mitchell or Lieutenant

24   Schofield?

25         A.      That could occur sometimes.

1    Every policy that the chief implements is not

2    given to the command staff to weigh in on.

3        Q.    Sure.

4        A.    Sometimes certain things are.

5    Sometimes they are not.

6        Q.    There's a weekly meeting on

7    Tuesdays for command staff --

8        A.    Correct.

9        Q.    -- right?  And as a member of

10   the captain's rank, Lieutenant Norris, then          02:22

11   captain, would be entitled to attend all

12   those meetings?

13       A.    Correct.

14       Q.    Not an option for Lieutenant

15   Mitchell or Lieutenant Schofield.

16       A.    Correct.

17       Q.    And the single determining

18   factor in Lieutenant Norris's promotion would

19   be his race and his position on the list.

20       A.    And his position on the list.          02:22

21   Yes.

22       Q.    Now let's talk about the current

23   number of lieutenants.  How many people sat

24   for the most recent captain's test?  Do you

25   know?

27

1          A.     How many sat for it?

2          Q.     Yeah.

3          A.     I do not know how many sat for

4    it.

5          Q.     Can -- and in these depositions,

6    if you're not familiar with the way this

7    works, I don't want your guess ever.

8          A.     Uh-huh.

9          Q.     I don't want you to speculate

10   ever.  Does me no use but I am entitled to          02:23

11   your best estimate.

12         A.     Okay.

13         Q.     So if you have something that

14   can reasonably approximate something, I'd

15   like to know what it is.  So --

16         A.     Okay.

17         Q.     -- can you estimate for me how

18   many lieutenants sat for the captain's test?

19         A.     So based on the list, the

20   captain's list, that's in front of me that          02:23

21   has 13 passing candidates, if every candidate

22   who took the test passed, then I would say 13

23   people took the test.

24         Q.     Sure.

25         A.     But I don't know if there are

1  some individuals who may not have passed and

2  therefore are not on the list.

3       Q.    What would you expect normally

4  would sit for a captain's test?

5       A.    How many lieutenants would sit

6  for it?

7       Q.    Yeah.

8       A.    I mean, that calls for quite a

9  bit of speculation on my part.

10       Q.    Well, then don't bother.          02:23

11       A.    Yeah.

12       Q.    The number of lieutenants on

13  the -- what I've marked as identification --

14  for identification as exhibit --

15       A.    Four.

16       Q.    No, not four.  Five.  It's

17  Exhibit 5.

18    (Exhibit 5 identified.)

19       Q.    I'm handing you what I've marked

20  for identification as Exhibit 5.             02:24

21       A.    Okay.

22    (Exhibit 6 identified.)

23       Q.    And I'm gonna hand you Exhibit 6

24  as well.  Can you identify for me what

25  Exhibit 5 is?

1          A.      The personnel distribution

2    report as of 10/17/2021.

3          Q.      And this report breaks down by

4    rank and race and gender every position

5    within the Cincinnati Police Department?

6          A.      Correct.

7          Q.      Across the top there's

8    abbreviations of chief, lieutenant colonel,

9    captain, lieutenant, sergeant, police

10   specialist, police officer and recruit,                    02:25

11   right?

12         A.      Correct.

13         Q.      And then at the bottom you have

14   male white, male black, female black, female

15   white, male other, female other.

16         A.      Okay.  Down here?  Yes.

17         Q.      Right.

18         A.      Uh-huh.

19         Q.      And so according to this

20   personnel distribution report, Exhibit 5,                  02:25

21   there are at the rank of lieutenant five male

22   blacks and five female blacks?

23         A.      Correct.

24         Q.      Do you know whether in the most

25   recent captain's exam all ten of them

30

1    attempted the test?

2         A.    I do not know for certain.

3         Q.    Is there any effort of which

4    you're aware specifically directed to those

5    officers to help them prepare for and study

6    to do well on the captain's test?

7         A.    I am not aware of any formal

8    preparation efforts.

9         Q.    Okay.  And do you personally do

10   anything to encourage them to take the test?          02:26

11        A.    No.

12        Q.    What about female whites, under

13   the rank of lieutenant it says there's seven

14   female white --

15        A.    Correct.

16        Q.    -- correct?

17        A.    Uh-huh.

18        Q.    How many of them -- do you know

19   how many of them sat for the most recent

20   captain's exam?                                        02:26

21        A.    I do not know.

22        Q.    Do you know when the current

23   eligibility list is set to expire?

24        A.    The current captain's list?

25        Q.    Yea.

31

1          A.     This one?

2          Q.     Exhibit 2.

3          A.     It's in May of 2022 but I don't

4    know the exact date.

5          Q.     Okay.

6          A.     It's one year from the time the

7    first person gets promoted.

8          Q.     Based on that expiration date

9    and your experience, is it likely that

10   Lieutenant Mitchell and Lieutenant Schofield          02:27

11   will get promoted?

12         A.     I think there is a greater

13   likelihood that Lieutenant Mitchell will get

14   promoted than there is for Lieutenant

15   Schofield to get promoted.

16         Q.     But it's not a given by any

17   sort --

18         A.     No.

19         Q.     -- for either.

20         A.     No, not a given.                          02:27

21         Q.     All right.  But it is a given

22   that Joe Richardson would get promoted?

23         A.     Correct.

24         Q.     And it is a given that if the

25   city follows through on the state court

32

1    consent decree Brian Norris would get

2    promoted.

3         A.    Yes.

4         Q.    The order of promotion into a

5    rank -- what is it you brought with you?  You

6    brought something called a seniority list?

7         A.    Correct.

8         Q.    Did you bring copies of that?

9         A.    No, I did not.

10        Q.    Do you care if we mark it?          02:28

11        A.    Sure.

12             MR. HICKS:  Want to make copies

13   of it?

14             MR. GOTTESMAN:  Sure.

15      (Break taken.)

16      (Exhibit 7 identified.)

17   BY MR. GOTTESMAN:

18        Q.    So, Colonel, looking at this,

19   what I've marked for identification as

20   Exhibit 7, that's a department seniority list    02:31

21   for the rank of captain that you prepared?

22        A.    That I printed. I didn't prepare

23   it but I printed it, yes.

24        Q.    And the seniority number

25   indicated on the left, that's driven by the

1    date of promotion?

2          A.    Correct.

3          Q.    So the earlier you were promoted

4    the more seniority you have?

5          A.    Correct.

6          Q.    And there are benefits to being

7    the most senior captain, correct?

8          A.    Such as?

9          Q.    What about scheduling?  Do you

10   get benefits in scheduling?                          02:31

11         A.    Not really.

12         Q.    Aren't there benefits for

13   scheduling vacation time if you're the most

14   senior?

15         A.    That comes into if you're

16   assigned in the same unit.  We don't have

17   captains assigned within the same unit.  So

18   if we have three lieutenants in a unit, they

19   pick their vacation based on seniority but

20   our captains all work independently --            02:32

21         Q.    All right.

22         A.    -- so that would not apply.

23         Q.    From your perspective, is there

24   any benefit to being the most senior captain?

25         A.    No.

1          Q.    So would -- in the current --
2     with the current chief, could all the
3     captains take off at the same time?
4          A.    No.
5          Q.    Yeah.  Somebody's got to stay,
6     right?  There's got to be captains on duty at
7     a certain time?
8          A.    Sure.
9          Q.    If several captains wanted to
10    take off and it would leave a gap in the                02:32
11    command staff, would it be seniority that
12    determined who could --
13         A.    Not -- not necessarily.  It may
14    be by who submitted their vacation request
15    first.
16         Q.    All right.  That's fine.  We're
17    in the weeds anyway.  We were talking about
18    the promotional -- pull out Exhibit 2 for me
19    again.
20         A.    Okay.                                         02:33
21         Q.    When we were discussing the
22    promotion of Lieutenant Norris and you said
23    it was based on his race and his position on
24    the list, do you recall that answer?
25         A.    I believe you said that and I

35

1    said correct.

2         Q.    Right.  So do you agree with me

3    that the reason he is getting -- he would be

4    the one promoted to captain in the event that

5    the city continued to implement the state

6    court consent decree, it promoted Lieutenant

7    Richardson and then promoted Lieutenant

8    Norris, the reason it would -- Lieutenant

9    Norris would be promoted over Lieutenant

10   Mitchell and Lieutenant Schofield is because          02:34

11   of his race?

12        A.    Correct.

13        Q.    Okay.  In the -- the company --

14   do you have any responsibility for picking

15   the company that administers the promotional

16   eligibility list?

17        A.    No.  I believe that is governed

18   by city HR.

19        Q.    And the current contractor that

20   provides that service is a company IO                  02:34

21   Solutions?

22        A.    IOS.

23        Q.    IO Solutions.  That's what that

24   stands for --

25        A.    I believe --

36

1      Q.      -- Industrial Occupational

2  Solutions.

3      A.      I believe it's something to that

4  effect, yes.

5      Q.      And IO Solutions when they

6  administer these tests they solicit from the

7  city subject-matter experts to advise them on

8  how to construct the test they will

9  administer, right?

10     A.      Correct.                                    02:35

11     Q.      And those are officers taken

12  from within the City of Cincinnati who are

13  deemed knowledgeable about the various

14  subject matter of policing and they then

15  interface with IOS and help them establish

16  the testing.

17     A.      And they are one rank higher

18  than what is being tested.  So if it's a

19  lieutenant's test that's being administered,

20  the SMEs would be captains.                             02:35

21     Q.      Okay.

22     A.      So they know what the

23  expectation is from a lieutenant.  That's why

24  we go one rank higher.

25     Q.      And the people who are selected

1   as SMEs, how is that progress undertaken?

2        A.   For the last several years in

3   the testing process I would submit a handful

4   of names to the chief making sure we have a

5   diverse pool of SMEs both in race, gender,

6   and professional experience --

7        Q.   Okay.

8        A.   -- and then he -- he decides

9   which three will be the SMEs.

10       Q.   So you pick the candidates, you   02:36

11  personally, Colonel Theetge?

12       A.   Because I have personnel in my

13  bureau.

14       Q.   Right.

15       A.   I pick several candidates.

16       Q.   And then the chief actually

17  selects who he picks to serve as SME?

18       A.   Yes.  And maybe they all come

19  from the ones I recommended or he may take

20  some and go outside and pick somebody else   02:36

21  that he thinks may be good in that role.  It

22  varies.

23       Q.   In doing that you do everything

24  you can to ensure that there's not some

25  racially discriminatory pool selected on

38

1    SMEs.

2            A.    Correct.

3            Q.    So that aspect of the

4    promotional exams is not in any way by design

5    discriminatory in its effect?

6            A.    Correct.

7            Q.    And you ensure that?

8            A.    I attempt to, yes.

9            Q.    Then IOS prepares the actual

10   test and it comes to Cincinnati where it's          02:37

11   administered, right?

12           A.    Correct.

13           Q.    And you understand IOS is

14   located in Chicago?

15           A.    I knew they were out of town.  I

16   didn't know exactly where they are.

17           Q.    They're in Chicago.

18           A.    Uh-huh.

19           Q.    And when they administer the

20   test, when IOS administers any promotional          02:37

21   eligibility exam, they do it under the

22   provision of Cincinnati Police command staff?

23           A.    Say that again.

24           Q.    When they actually administer

25   the test to the candidates, there are

1    representatives of the Cincinnati Police

2    Department command staff present to ensure

3    its fair administration.

4         A.    No.  That is governed by city

5    HR.

6         Q.    Okay.

7         A.    Like proctoring the test so to

8    speak?

9         Q.    Right.

10        A.    That is city HR.                        02:38

11        Q.    Okay.  So the city HR

12   department --

13        A.    Uh-huh.

14        Q.    -- administers the actual test.

15        A.    Correct.

16        Q.    Now, Bruce Ross was involved in

17   administering the last lieutenant's exam if

18   I'm not mistaken, right?

19        A.    I believe so.  I believe so.

20   There were some changes going on during that   02:38

21   time so...

22        Q.    I know that he was moved out but

23   his office was at 310 Ezzard Charles?

24        A.    Correct.

25        Q.    And even though he was city HR,

1   his primary focus was on police HR, right?

2          A.    So he was a member of the

3   Cincinnati Police Department, a civilian

4   member of the police department.  When I say

5   there were changes going on at that time, it

6   was -- and they are still not ironed out but

7   there was an attempt to take some of that

8   workload, some workload, one of them being

9   the testing component, off of city HR

10  completely and shared with somebody in Bruce          02:39

11  Ross's role at the police department at the

12  time, but it was still a concerted effort

13  between police department --

14         Q.    HR.

15         A.    -- Bruce Ross and city HR.  So

16  Bruce Ross was not administering the test.

17  He was assisting HR.

18         Q.    Okay.  Is Letitia Hazell with

19  city HR?

20         A.    Yes.                                      02:39

21         Q.    Okay.  Now, in the process of

22  actually administering the test, are you

23  familiar with how that's done?

24         A.    I've not been in the room while

25  a test is being administered other than my

41

1    own so...

2         Q.    Do you have any reason to

3    believe as the lieutenant colonel in charge

4    of personnel that that administration is in

5    some way racially discriminatory?

6         A.    No.

7         Q.    Do you have any reason to

8    believe that administration of the test

9    discriminates based on gender in any way?

10        A.    No.                                          02:40

11        Q.    In fact, actual steps are taken

12   to ensure that it is not corrupted by

13   discrimination either racial or gender based,

14   correct?

15        A.    Correct.

16        Q.    And those steps are effective?

17        A.    I believe so.

18        Q.    So then once the -- there are

19   assessors that serve as part of this process

20   for the subjective portions of the test,              02:40

21   correct?

22        A.    Correct.

23        Q.    And those assessors are selected

24   from police jurisdictions other than

25   Cincinnati?

1      A.    Yes.

2      Q.    And the reason those police

3 assessors are selected from cities other than

4 Cincinnati is so they're not necessarily

5 familiar with the candidates.

6      A.    Correct.

7      Q.    And then the candidates are told

8 to use Neogov numbers as opposed to their

9 personal names to further guarantee fairness

10 in the administration of the test.          02:40

11      A.    Correct.

12      Q.    That's to allow the applicants

13 to proceed through the process

14 confidentially.

15      A.    Correct.

16      Q.    And in that selection of

17 assessors, they are picked by IO Solutions?

18      A.    I'm not sure if they're picked

19 by IO Solutions or city HR or a joint effort

20 between the two.                            02:41

21      Q.    Are you aware of any racially

22 discriminatory motive or bias on the part of

23 the assessors?

24      A.    No.

25      Q.    So as you understand the

43

1 process, the assessors would not discriminate

2 against candidates based on their race?

3          A.     Correct.

4          Q.     And then once the assessors

5 render a score and then there's an objective,

6 I think, multiple-choice portion of the test

7 that generates a score, those scores are

8 compiled and then points are added for

9 seniority and that's how a candidate's rank

10 on the list is determined.                      02:42

11          A.     Correct.

12          Q.     And that process, to the extent

13 it's possible, is as free from racial bias as

14 it could be.

15          A.     I believe so.

16          Q.     And it's as free of gender bias

17 as possible.

18          A.     I believe so.

19          Q.     So that the end result, what I

20 marked as Exhibit 2, comes out based on how     02:42

21 the candidate performed in that testing

22 process not based on gender or race.

23          A.     Correct.

24          Q.     Is there some reason that you're

25 aware of that black candidates don't or

44

1  cannot compete with white candidates in that
2  promotional eligibility testing process?
3          A.    No.
4          Q.    Is there some reason that you're
5  aware of why females cannot compete with
6  their male counterparts in that promotion
7  eligibility testing process?
8          A.    No.
9          Q.    Everybody can compete fairly to
10 do as well as possible on that test.                    02:43
11         A.    I believe so.
12         Q.    In your experience, do all
13 candidates for that test put in the same
14 amount of preparation?
15         A.    I don't know.
16         Q.    You don't know if they all put
17 in the same amount?
18         A.    I don't know.  I mean, I know
19 people who have studied for a year.  I know
20 some who study six months.                              02:43
21         Q.    So in your experience, people do
22 put in different amounts of preparation?
23         A.    Correct.  Correct.
24         Q.    Is it your experience further
25 that more preparation helps candidates

1    perform better on the test?

2        A.    Based on my own experience?

3        Q.    Yes.

4        A.    Not necessarily.

5        Q.    Okay.  As a general rule, would

6    you expect better preparation to render a

7    better result on the test?

8        A.    Not necessarily.

9        Q.    Not necessarily but as a general

10   rule?                                              02:43

11       A.    I would be speculating to say

12   that.

13       Q.    Okay.  Fair enough.  Did you

14   talk to the Chief after his deposition

15   yesterday?

16       A.    No.

17       Q.    Have you been told how the Chief

18   testified yesterday --

19       A.    No.

20       Q.    -- in any regard?                        02:44

21             MR. HICKS:  Objection to the

22   extent it's attorney-client privilege.

23       Q.    Other than Mr. Hicks.  I don't

24   want to hear at any point during this

25   deposition your conversations with Mr. Hicks.

```
1   Okay?
2           A.      Say that again.
3           Q.      I don't want to know what you
4   and Mr. Hicks have discussed.
5           A.      Okay.
6           Q.      It's nothing I'm entitled to.
7           A.      Okay.
8           Q.      Do you -- as a colonel --
9   assistant chief and colonel in the police
10  department, do you want to see this state      02:44
11  court consent decree to be continuously
12  enforced?
13              THE WITNESS:  Will?  I don't
14  know --
15              THE REPORTER:  I can't hear you,
16  ma'am.  What did you ask him?
17              THE WITNESS:  I'm asking him for
18  the attorney --
19              MR. HICKS:  She's asking -- I
20  can't prevent you from answering.             02:45
21              THE WITNESS:  Okay.  I believe
22  it's beneficial to the department and
23  therefore beneficial to the city and the city
24  administration to have diversity in the ranks
25  and I think the department and the city has
```

47

1   been benefitted over the years on promotions

2   that occurred because of the consent decree.

3   BY MR. GOTTESMAN:

4        Q.    Do you agree that the consent

5   decree is racially discriminatory?

6        A.    No.

7        Q.    You do recognize it confers a

8   benefit on black officers and women that it

9   will not confer on white males?

10        A.    Yes.                                   02:45

11        Q.    So it does discriminate against

12   white males?

13            MS. BAILEY:  Objection.

14        Q.    Go ahead.

15        A.    I do not believe it

16   discriminates against white males because I

17   do not believe that they suffer because of

18   it.  Because the way the double fill is done,

19   it does not take a spot or an opportunity

20   from the next male white on the list.  The     02:46

21   way double fills work and then attrit out, I

22   do not believe it takes an opportunity away

23   from a male white.

24        Q.    So we just talked about how when

25   Richardson is being promoted there's actually

48

1    two people being promoted.

2          A.    Correct.

3          Q.    And the next person on the list

4    would be Andrew Mitchell.

5          A.    Correct.

6          Q.    And he's not being promoted

7    because of his race.

8          A.    Okay.

9          Q.    Do you agree?

10         A.    Correct.                                02:46

11         Q.    But if he was a black guy he

12   would be getting promoted.

13         A.    Correct.

14         Q.    So Brian Norris is getting

15   promoted --

16         A.    Correct.

17         Q.    -- even though he scored lower

18   than Lieutenant Mitchell on the list and

19   you're telling me that that's not -- you

20   don't see any unfairness in that?                   02:47

21         A.    But I do not see where

22   Lieutenant Mitchell as a male white

23   because -- because there are -- there's not a

24   spot, an open vacancy, for Lieutenant

25   Mitchell.  When Broxterman left, there is an

49

1    opening for Joe Richardson.  There is not a

2    vacancy for Andy Mitchell.

3            The overfill is not filling a

4    vacancy, per se.  It is then attrited out.

5    So I guess that's up to interpretation

6    whether or not that is racially

7    discriminatory or not.

8        Q.    I mean we're promoting one

9    lieutenant based on his race where we would

10   not promote another lieutenant even though he        02:47

11   had scored higher.

12       A.    Right.

13       Q.    That's racial discrimination,

14   right?

15            MS. BAILEY:  Objection.

16       Q.    Yes?

17       A.    But I --

18            MS. BAILEY:  Objection.  Go

19   ahead.

20            MR. GOTTESMAN:  You got to let        02:47

21   her get her answer in.  I don't mind you

22   making --

23            MS. BAILEY:  You asked a new

24   question.

25            THE WITNESS:  But what I'm

50

1    saying --

2            MR. GOTTESMAN:  I need you to go

3    back and --

4            THE WITNESS:  Go ahead.

5            MR. GOTTESMAN:  Did you get her

6    answer to that?

7            THE REPORTER:  No.

8    BY MR. GOTTESMAN:

9        Q.    Okay.  So that's racial

10   discrimination what we just talked about with          02:48

11   promoting Brian Norris because of his race

12   over Andy Mitchell even though Andy Mitchell

13   scored higher on the promotional eligibility

14   exam --

15           MS. BAILEY:  Objection.

16       Q.    -- correct?

17       A.    Okay.

18       Q.    I'm asking you a question.  Yes

19   or no?

20       A.    Say that again.  I'm sorry.                   02:48

21       Q.    It is racial discrimination to

22   promote Brian Norris because he's black over

23   Andy Mitchell because he's white even though

24   Andy Mitchell got a higher score on the

25   promotional eligibility list.

1      A.      I do not --

2      Q.      Yes or no?

3              MS. BAILEY:  Objection.  Go

4   ahead.

5      A.      No.  And if I can explain why I

6   say that.

7      Q.      Go ahead.

8      A.      Okay.  I do not believe it's

9   racially discriminatory because I have a

10  document that tells me when I promote whom          02:49

11  and I am not bypassing Lieutenant Mitchell

12  because he is white.  I am pulling up Brian

13  Norris because I have a document telling me

14  to do that.

15     Q.      But that document identifies

16  racial characteristics for promotion.

17     A.      Correct.

18     Q.      And if Andy Mitchell was a black

19  guy, he would be promoted?

20     A.      Correct.  Based on this document          02:49

21  that tells me I must promote the next

22  minority.

23     Q.      But because he's white, he's not

24  getting the promotion.

25     A.      Correct.

1          Q.     Fair enough.  Is the current
2    level of diversity within the classified
3    civil service adequate from your perspective?
4          A.     Are you talking about the sworn
5    members of Cincinnati Police as a whole?
6          Q.     Classified civil service of the
7    Cincinnati Police which is the ranks of PO,
8    sergeant, lieutenants, captain.
9          A.     I believe we should make efforts
10   to increase our diversity.                          02:50
11         Q.     That was not really responsive
12   to my question.  I was asking this:  Are you
13   satisfied with -- personally satisfied, do
14   you think it's adequate, the current levels
15   of diversity, minority and female
16   participation in the classified civil
17   service --
18         A.     No.
19         Q.     -- in the Cincinnati Police
20   Department?  And what -- why do you say that?      02:50
21         A.     Because the little research that
22   I've done based on the census data for the
23   City of Cincinnati, I don't think our police
24   department reflects our community at this
25   time.

53

1        Q.    Okay.  And you recognize that
2   this Exhibit 1, the state court consent
3   decree, has been in effect since September
4   14, 1987.
5        A.    Yes.
6        Q.    And the other consent decree has
7   been in effect -- the federal consent decree
8   has been in effect since 1980, right?
9        A.    I believe so.
10        Q.    And so would you agree with me        02:51
11   that the state court consent decree has not
12   been an effective tool for creating the
13   diversity you think is appropriate at the
14   rank of lieutenant and captain?
15        A.    No.  I disagree with that
16   comment.
17        Q.    Okay.  Well, if it's been in
18   effect since 1987, why are the diversity
19   levels still inadequate if it's an effective
20   tool?                                            02:51
21        A.    Because if we didn't have that I
22   think our diversity levels would be even
23   lower.
24        Q.    Okay.  So how many times has the
25   promotion to the rank of captain been

54

1   effected by that state court consent decree

2   and the double filling of a position?

3          A.    For the rank of captain?

4          Q.    Yes.

5          A.    To my knowledge, this is the

6   first list that I'm personally aware of that

7   the consent decree would be put into effect.

8          Q.    So even though it's been in

9   effect in it's -- since 1987, based on what

10  you know, nobody has ever been promoted to          02:52

11  the rank of captain as a double fill?

12         A.    I just started in 1990, so I

13  wasn't hired when this was in effect.  Early

14  in my career, I really didn't pay attention

15  to this but the last few years of my career I

16  am unaware of the consent decree for the rank

17  of captain being utilized.

18         Q.    So then would you agree with me

19  it's had no beneficial effect in achieving

20  diversity at the rank of captain?                   02:52

21         A.    The rank of captain, correct.

22  But that wasn't your question before.

23         Q.    That's right.  That's right.

24  And there is the lieutenant's portion on it,

25  right?

1         A.    Yes.   And you were asking me

2    about the department as a whole before.

3         Q.    The classified civil service for

4    the two ranks.

5         A.    Correct.

6         Q.    Now I've split it in two.  How

7    many lieutenants have been promoted as a

8    result of a double fill created by the state

9    court consent decree?

10        A.    I don't know the answer to that.        02:53

11        Q.    You can't estimate it for me one

12   way or the other?

13        A.    No.

14        Q.    So you don't know what -- if you

15   don't know the number, you can't tell me

16   what, if any, actual affect the state court

17   consent decree has had on the rank of

18   lieutenant either?

19        A.    I know we have had promotions at

20   the rank of lieutenant because of the consent      02:53

21   decree.  I can't tell you how many.

22        Q.    So --

23        A.    It could be two.  It could be

24   20.

25        Q.    So one way or the other, as we

56

1  sit here now, you have inadequate information

2  to say what, if any, beneficial effect that

3  consent decree has had on the rank of

4  lieutenant.

5          A.   I wouldn't say inadequate

6  information.  I'd say personal knowledge.  I

7  do not have personal knowledge to answer

8  that.

9          Q.   Fair enough.  Since 2011 the

10  chief of police for the City of Cincinnati          02:55

11  has been a male black, correct?

12          A.   Yes.

13          Q.   And that started with James

14  Craig?

15          A.   Correct.

16          Q.   And then he was followed by

17  Blackwell?

18          A.   Correct.

19          Q.   And then Chief Eliot Isaac,

20  right?          02:55

21          A.   Correct.

22          Q.   And you have been a lieutenant

23  since 2004 and a captain since 2007 prior to

24  your ascension to lieutenant colonel in '16?

25          A.   Correct.

1      (Exhibit 3 was referenced.)

2      Q.   You have before you what I've

3  market as Exhibit 3.  Do you recognize that

4  as the Cincinnati Police Department policy

5  prohibiting EEO harassment and

6  discrimination?

7      A.   Correct.

8      Q.   Have you under any of those

9  police chiefs observed active discrimination

10  against blacks or women?                          02:56

11      A.   No.

12      Q.   And how about since you were

13  promoted to captain in 2007?  Certainly you

14  would be responsible for ensuring compliance

15  with that policy, right?

16      A.   Correct.

17      Q.   Within your purview.  Not

18  department wide but in your department,

19  right?

20      A.   Correct.                                  02:56

21      Q.   Is it -- have you observed

22  actual discrimination against minorities or

23  against women since you've attained the rank

24  of captain in 2007?

25      A.   No.

58

1          Q.     Have you observed any

2    discrimination by the city in preventing

3    minorities from succeeding in the promotional

4    exam testing process for any of the

5    classified civil service positions in the

6    police department?

7          A.     No.

8          Q.     Are you aware of any challenges

9    that -- legal challenges that have been filed

10   against any of the promotional testing              02:57

11   processes that have been implemented, say,

12   since 2010 to the present?

13         A.     We had the one lieutenant's list

14   that the vendor --

15         Q.     Ergometrics?

16         A.     -- made a debacle.

17         Q.     Right.

18         A.     Yes.  I was very much involved

19   in that process.

20         Q.     And that was a mess.  There was        02:57

21   a grading problem.

22         A.     That was a hot mess.  Yes.

23         Q.     That resulted in a federal court

24   case, right?

25         A.     Correct.

1    Q.    Would you agree with me that

2    that -- the problem -- the defect in that

3    process was not in any way racially

4    discriminatory?

5    A.    Correct.

6    Q.    It was just a mistake by the

7    contractor who administered the test and

8    graded?

9    A.    A major mistake by the

10    contractor.                                      02:58

11    Q.    Are you aware of any discussions

12    within the city -- and again I'm gonna

13    caution you I'm not asking for

14    attorney-client communications.  Okay?

15    A.    Okay.

16    Q.    Are you aware of any discussions

17    about when, if ever, to terminate the state

18    court consent decree?

19    A.    Just when the Judge Dlott one

20    came up and then, you know, we just assumed   02:58

21    that the state one would be next to be

22    challenged and I think the question has

23    always been what do we do, what kind of

24    mechanism can we put in place to ensure

25    diversity --

1        Q.     To maintain --

2        A.     -- if we don't have these.  Yes.

3        Q.     Right.

4        A.     Yes.

5        Q.     Have you personally done any

6    analysis of the law that pertains to

7    race-based promotion and hiring programs for

8    government agencies?

9        A.     No.

10        Q.     Are you -- do you have an                02:59

11    understanding of how long in the absence of

12    court action by plaintiffs such as I

13    represent, how long that state court consent

14    decree would remain in effect?

15        A.     I have no idea.

16        Q.     Is it your understanding it

17    would remain in perpetuity?

18        A.     I would assume so.

19        Q.     Are you aware of any -- back up.

20    With regard to all the policies and            03:00

21    procedures in effect at the Cincinnati Police

22    Department, there is a regular review and

23    evaluation of those policies, correct?

24        A.     On each and every one of them

25    regularly?  No.

1     Q.    The standing orders are the

2  policies and procedures of the Cincinnati

3  Police Department are regularly reviewed to

4  be updated or to be changed to reflect

5  changes in personnel or community needs; is

6  that true?

7     A.    The way you worded it, that is

8  not accurate.

9     Q.    Okay.  Is there a regular review

10 of policies and procedures?                      03:00

11    A.    What happens is if something --

12 let's say there's a new court decision that

13 effects what we do on a daily basis.  Then

14 our planning section will take that court

15 decision, look at it according to our

16 policies and procedures and see if it's

17 something in our procedure manual needs to be

18 updated.

19    Q.    Okay.

20    A.    But the way you worded it would    03:01

21 lead somebody to believe that every one of

22 our policies and procedures are reviewed

23 regularly.  That would be an impossible task.

24    Q.    So has there ever been a review

25 of the policy to promote based on race or

1    gender that you're aware of?

2          A.    Not that I'm aware of if I'm

3    understanding your --

4          Q.    Yeah.

5          A.    -- statement correctly.

6          Q.    My question is:  The federal

7    consent decree and the state court consent

8    decree, are you aware of -- even though there

9    have been changes to the law -- anybody who

10   has ever gone to evaluate those policies?          03:01

11         A.    No.

12         Q.    You know what, give me just a

13   moment, let me confer with cocounsel.

14         A.    Sure.

15     (Break taken.)

16   BY MR. GOTTESMAN:

17         Q.    So if the city were to continue

18   to enforce the state court consent decree,

19   would you agree that Andrew Mitchell and

20   David Schofield would be denied equal              03:05

21   treatment in terms of promotional opportunity

22   to the benefit of Brian Norris because of the

23   city's use of racial preferences?

24         A.    No.  Because there would not be

25   a vacancy for Andy Mitchell to get promoted

63

1    into.

2          Q.    That's the double-fill theory,

3    right?  The double fill idea?

4          A.    Right.

5          Q.    Do you -- do you believe that

6    white officers cannot effectively serve as

7    police in minority communities?

8          A.    Do I not believe --

9          Q.    No.

10         A.    Do I believe --                          03:06

11         Q.    I'll ask it again.

12         A.    -- that they cannot?  Go ahead.

13         Q.    Do you believe that white

14   officers cannot effectively police minority

15   communities?

16         A.    No.  I believe that they can.

17         Q.    Okay.  Do you believe that

18   minority officers do a better job than white

19   officers in policing minority communities?

20         A.    I think they -- our officers are    03:06

21   trained to do -- be able to do the same job

22   no matter what their race or gender is.

23         Q.    Okay.  In fact, that's part of

24   the promotional testing process, that

25   cultural sensitivity, correct?

64

1       A.      The promotional process?

2       Q.      Promotional testing process.

3   There are questions in the tests themselves

4   to gauge an applicant's ability to recognize

5   and be sensitive to cultural differences.

6       A.      I have not taken a test for a

7   while so I'm not sure if those questions are

8   in there or not.  That would be a question

9   for IOS.

10      Q.      If the Chief says that those are          03:07

11  part of the testing process, would you

12  contradict him on that?

13      A.      No.

14      Q.      In fact, there could be white

15  officers who are excellent at working in

16  minority communities, right?

17      A.      Sure.

18      Q.      And they may be better than some

19  black officers at policing in minority

20  communities.  Would you agree?                       03:08

21      A.      Could be.

22      Q.      So race by itself would not be a

23  determining factor --

24      A.      No.

25      Q.      -- in the efficacy of a police

1    officer in any given application?

2         A.    Correct.

3         Q.    So just before we adjourn or

4    before I yield, I want to make sure --

5         A.    These are in order.  One, two --

6         Q.    You recognize Exhibit 1 is the

7    state court consent decree?

8         A.    Correct.

9         Q.    Exhibit 2 is the captain's

10   promotional eligibility list or the most          03:09

11   recent version?

12        A.    Correct.

13        Q.    And Exhibit 3 is the Cincinnati

14   Police Department policy on harassment and

15   discrimination?

16        A.    The EEO complaint process.

17        Q.    Right.

18        A.    Uh-huh.

19     (Exhibit 4 was referenced.)

20        Q.    Exhibit 4 is a personnel            03:09

21   distribution report dated August 22nd of

22   2021?

23        A.    Correct.

24        Q.    And then there's Exhibit 5 is a

25   personnel distribution report the most recent

1    version available dated October 17, 2021?

2          A.    Correct.

3          Q.    And then there's further --

4    Exhibit 6 is a personnel -- police department

5    personnel summary that lays out specifics of

6    different ranks and the staffing at those

7    ranks and the gender and ethnic background of

8    those ranks.

9          A.    Are you saying Exhibit 6 has

10   gender --                                          03:10

11         Q.    I thought --

12         A.    No.

13         Q.    I didn't even look.

14         A.    That's on the distribution

15   report.

16         Q.    Mr. Hicks provided me with

17   Exhibit 6 and I don't know what it is but I'm

18   gonna leave it in the record.

19              MR. THUMANN:  He's trying to

20   trick you.                                          03:10

21         Q.    And then Exhibit 7 is the

22   seniority list of the current captains,

23   right?

24         A.    Correct.

25         Q.    And if you look at the seniority

1    of the various -- the captains on that list,

2    the current most senior captain is Doug

3    Wiesman?

4         A.    Wiesman, correct.

5         Q.    When -- if Captain Wiesman were

6    to retire, when would that retirement occur

7    based -- if you can tell, based on his date

8    of hire?  Is that something --

9         A.    It all depends if he

10   participated in our deferred retirement

11   option plan.

12        Q.    The DROP program?

13        A.    Yeah.  Yeah.  So I don't know.

14        Q.    Do you know whether -- have you

15   heard -- I mean, generally if somebody's

16   going to retire it's -- there's a rumor mill,

17   there's discussion going around.  Do you know

18   if Captain Wiesman has plans to retire?

19        A.    I do not know 100 percent

20   certainty.

21        Q.    What -- do you have -- have you

22   heard rumors that he might or he's not?

23        A.    I know that Captain Wiesman was

24   in the recruit class six months before me, so

25   he can retire six months prior to what my

03:11

03:11

1  retirement date could be if he's

2  participating in the DROP program.

3          Q.    Okay.  When would that be?

4          A.    Which would be about 19 months

5  from now.

6          Q.    So that would be after the list

7  expires?

8          A.    Yes.

9          Q.    Okay.  And there's no one else

10  on this list who has served longer than that,        03:12

11  is there?

12         A.    Then we would have to go to

13  their hire date to know that.  No.  Nobody

14  longer.

15         Q.    So a 1990 hire, he's also the

16  longest serving captain.

17         A.    Correct.

18         Q.    And he would be the first to

19  retire if anyone's gonna retire?

20         A.    Not necessarily.  Like, the        03:12

21  lowest ranking captain was in my recruit

22  class so if he's participating in DROP, he

23  could leave in approximately two years --

24         Q.    Okay.

25         A.    -- but a lot of other things can

1   come into play.  If they opt to go into

2   option one, some these, many of these could

3   do that tomorrow.

4        Q.    All right.  From your review of

5   that list, are you aware of anyone with plans

6   to retire that's imminent?

7        A.    Not to my knowledge.  I haven't

8   discussed it with any of them.

9             MR. GOTTESMAN:  All right.

10  Counsel, I yield the witness.                    03:13

11            MS. BAILEY:  Okay.  Thank you.

12            CROSS-EXAMINATION

13  BY MS. BAILEY:

14       Q.    Officer, my name is Donyetta

15  Bailey and I represent Lieutenant Brian

16  Norris in this action.  I just want to ask

17  you a few follow-up questions.  So with

18  respect to the captain's exam or testing, I

19  believe you said that was done by a

20  third-party vendor.  Is it IOS?                   03:13

21       A.    Correct.

22       Q.    Okay.  You don't have any role

23  in the creation and implementation of that

24  testing process, correct?

25       A.    I suggest SMEs to the chief and

70

1    then the chief makes that determination.

2    That's pretty much my limited role in the

3    testing process.

4         Q.    Okay.  And what's an SME?

5         A.    Subject-matter expert.

6         Q.    Okay.  So you make a

7    recommendation of subject-matter experts that

8    are gonna serve in what capacity in the

9    testing process?

10        A.    They assist IOS and city HR.                03:13

11   Like I said, it's one rank higher than what

12   is being tested, so for the captain's exam it

13   would be assistant chiefs that assist.  In

14   this particular incident, we have limited

15   number of assistant chiefs to choose from and

16   myself as the executive officer was not

17   partaking in it so the other assistant chiefs

18   would have assumed that SME role.

19        Q.    And what does an SME do with

20   respect to the testing process?                        03:14

21        A.    Because they have -- had been at

22   the rank that's being tested, so an assistant

23   chief had recently probably been a captain, I

24   don't know how recent but their last rank

25   they held would have been a captain, they

1  know what the roles and responsibilities of a

2  captain are.  So they want to educate the

3  vendor to broadly what they should be testing

4  for.

5          Q.    So the topics of the testing?

6          A.    The topics, the interpretation

7  of our procedures, who is expected to do what

8  under certain types of scenarios.  Things

9  like that.

10         Q.    And so in this case the                     03:15

11  subject-matter experts that were chosen were

12  the two other assistant chiefs?

13         A.    So when the captain's exam was

14  administered I believe Colonel Mack was still

15  here.  Colonel Martin Mack.  He has since

16  retired.  I believe Colonel John, who is

17  still here, was also the SME -- was also an

18  SME.  I was not one.  I do not recall whether

19  or not Colonel Davis assisted with that SME

20  process or not.                                           03:15

21         Q.    Okay.  And the people that you

22  just named, what race where they?

23         A.    Colonel Mack is a male black.

24         Q.    Uh-huh.

25         A.    Colonel John is a male white.

72

1          Q.     Okay.  And the people that are
2     chosen to be subject-matter experts for any
3     of the promotional exams that are subject to
4     the consent decree, I guess that would be
5     captain and lieutenant, is it always somebody
6     from within the department or do you get
7     subject-matter experts from outside the
8     department?
9          A.     So the SMEs to assist in writing
10    or compiling are from within.                              03:16
11         Q.     Okay.
12         A.     The assessors that they use
13    during the promotional testing process are
14    external to the police department.
15         Q.     Okay.  And so earlier I believe
16    you testified that you haven't observed any
17    discrimination preventing minorities from
18    succeeding in the promotional testing
19    process.  Did I get that testimony right?
20         A.     Correct.                                       03:16
21         Q.     But isn't it true or fair to say
22    that you're not involved in the promotional
23    testing process, it's contracted out, so you
24    wouldn't be aware one way or the other?
25         A.     Correct.

73

1        Q.    And I believe earlier you also
2    testified that the testing process is free of
3    gender or racial bias, but, again, you don't
4    have any or have a limited role in
5    administration of the test.  That's done by a
6    third-party vendor.  So, again, isn't it fair
7    to say that you wouldn't know if there was
8    gender or racial bias in the administration
9    of the test one way or the other?
10       A.    Correct.                                03:17
11       Q.    Earlier I believe you said that
12   the city has taken steps to ensure that the
13   testing process is fair and free from
14   discrimination.  Did I get your testimony
15   right?
16       A.    Say that again.
17       Q.    Earlier I believe you testified
18   that the city has taken steps to ensure that
19   the testing process is fair and free from
20   discrimination.  Is that true?                   03:18
21       A.    Correct.
22       Q.    What are those steps that
23   they've taken?
24       A.    Because we have a diverse -- we
25   try to maintain diversity at the SMEs.  The

74

1    assessors, there's a diverse pool of

2    candidates that come in to be the assessors.

3    So I think we try to ensure that there is no

4    bias based on the individuals that we use to

5    assist with the administration of the test.

6          Q.    So the steps that you're saying

7    it's taken is basically to make sure that

8    there's a diverse pool of assessors?

9          A.    That -- yes.  Because I don't

10   work with the vendor to write the test, so I          03:18

11   don't know what IOS would do to ensure that

12   there's no bias in the test as it's written,

13   but from what role I play, we try to

14   maintain -- make sure there's diversity in

15   the SMEs, make sure there's diversity in the

16   assessors.

17         Q.    I thought the assessors were

18   chosen by the vendor.

19         A.    They are chosen by the vendor,

20   but typically what I will do then when the            03:19

21   assessors arrive is I will greet them, I will

22   give them an overview of the police

23   department, and one of the things that I do

24   when I'm there is -- in the room is this a

25   diverse group, panel, of assessors in the

1    room.

2         Q.    Are you aware of the concept of

3    implicit bias?

4         A.    Yes.

5         Q.    Can you tell me what your

6    awareness is of that concept?

7         A.    I think it's very hard to

8    define.  Extremely hard to define.  But I

9    think it's a preconceived notion of what you

10   believe, whether you realize it or not, based          03:19

11   on somebody's race, gender, or other traits.

12        Q.    Does the City of Cincinnati

13   provide implicit bias testing to any of its

14   officers?

15        A.    Testing?  No.  Training.  We do

16   implicit bias training.

17        Q.    But you haven't given or

18   administered implicit bias testing to see if

19   any of your officers demonstrate or have

20   implicit biases?                                        03:20

21        A.    I do not believe that the

22   training we administered had, like, a pre or

23   post test or anything like that, so no.

24        Q.    And so the people that you all

25   would select to be subject-matter experts for

1    any of these tests, have they ever been given

2    an implicit bias test to ensure that they

3    don't come to the test or to their job with

4    implicit biases?

5        A.    Not to my knowledge.

6        Q.    And you're aware that African

7    Americans and whites alike can both have

8    implicit biases against other African

9    Americans.  Are you aware of that fact?

10        A.    Yes.                                03:20

11        Q.    So would you agree with me that

12    just because you have a diverse pool of

13    subject-matter experts as assessors doesn't

14    mean that that's gonna guarantee that the

15    test is free from bias of race or gender,

16    correct?

17        A.    Correct.

18        Q.    Aside from making sure the

19    subject-matter experts and the assessors are

20    a diverse pool of people, does the city do   03:21

21    anything else to ensure that the testing

22    process is fair and free from discrimination?

23        A.    I think that would be -- have to

24    be a question for city HR.  We don't get into

25    that portion -- the police department does

1    not get into that portion of the testing

2    process.

3         Q.    And is there a particular person

4    at city HR that we could contact?

5         A.    I believe it would be Letitia

6    Hazell.

7         Q.    I'm sorry.  How do you spell

8    that?

9         A.    H-A-Z-E-L-L.

10        Q.    And do you know Letitia's race?          03:21

11        A.    She's African American.

12        Q.    And I think you may have already

13   said this but I just want to make sure.  If

14   we could go back to -- sorry.  My exhibits

15   are out of -- Exhibit 2 I believe.

16        A.    Two?

17        Q.    Yes.

18        A.    Okay.

19        Q.    And if I understand you

20   correctly, there's currently or soon to be a     03:22

21   vacancy in the captain's compliment because

22   someone is going to retire?

23        A.    They retired this past Saturday.

24        Q.    And who was that person?

25        A.    Paul Broxterman.

1        Q.      How do you spell his last name?

2        A.      B-R-O-X-T-E-R-M-A-N.

3        Q.      And he retired on what date?

4    I'm sorry.

5        A.      Saturday.  I'm not sure what

6    that date was.

7               MR. GOTTESMAN:  Sixteenth.

8               THE WITNESS:  Sixteenth?

9    October 16th, 2021.

10   BY MS. BAILEY:

11       Q.      And so because he retired then

12   we go back to the list and it's my

13   understanding that Joe Richardson will be

14   next in line to get promoted to the position

15   of captain?

16       A.      Correct.

17       Q.      Okay.  And if we had no consent

18   decree, Andrew Mitchell would not be eligible

19   to be promoted to captain until someone else

20   either -- was removed from the captain's              03:23

21   position, correct?

22       A.      Retirement, resignation,

23   something like that.  Yes.

24       Q.      And that's regardless of the

25   consent decree?

1    A.    Correct.

2    Q.    So the only thing the consent

3 decree does is move Brian Norris up and

4 create a position, a captain's position, for

5 him but it doesn't take away an opportunity

6 for Andrew Mitchell or David Schofield to

7 move up to a vacancy that's created in the

8 future, correct?

9    A.    Correct.

10    Q.    So their position or their spot          03:23

11 in the line with regard to captain is, would

12 you agree with me, unaffected by the city's

13 use or nonuse of the consent decree?

14    A.    Correct.

15    Q.    That's all I have.

16          RECROSS-EXAMINATION

17 BY MR. GOTTESMAN:

18    Q.    So really quick -- we're almost

19 done.  We're definitely gonna make our

20 4 o'clock exit strategy.          03:24

21    A.    Okay.

22    Q.    The way that the -- when there's

23 a double fill, it increases the number

24 serving in a given rank, correct?

25    A.    Correct.

1        Q.      By one.  If there's another
2    double fill, it could increase it by two.
3        A.      Correct.
4        Q.      And then gradually after the
5    list is expired and there's attrition at
6    that -- at that rank, the compliment goes
7    back or is absorbed back to its original
8    number.
9        A.      Correct.
10        Q.      Now, the need to conduct a                    03:24
11    promotional exam is triggered when there
12    becomes an opening at any compliment.
13        A.      Correct.
14        Q.      And so if there were a double
15    fill by promotion of Lieutenant Richardson
16    and Lieutenant Norris, it would create that
17    extra member in the captain compliment.
18        A.      Correct.
19        Q.      And the need to conduct a
20    captain promotional exam wouldn't happen on             03:25
21    the first retirement at the rank of captain,
22    it would be delayed until the second
23    retirement or second resignation or second
24    vacancy at that.
25        A.      Correct.

81

1        Q.    And that would result in a delay
2    in the administration of the captain's
3    promotional test -- the next administration
4    of the captain's promotional test.
5        A.    Correct.
6        Q.    Thank you.
7              RECROSS-EXAMINATION
8    BY MS. BAILEY:
9        Q.    Just one followup.  And so even
10   though it would result in a delay, once the        03:25
11   list expires you have to -- the people that
12   are on the existing list in Exhibit 2, they
13   have to start all over, correct?
14       A.    Correct.  They have to test.
15       Q.    And so they have to retest and
16   re-rank like everybody else?
17       A.    Correct.
18       Q.    And so there's no guarantee when
19   we do another test after the list expires
20   that Andrew Mitchell or David Schofield would     03:26
21   remain in position five and six or one
22   through 13.
23       A.    Correct.
24       Q.    It's possible that somebody -- a
25   new officer could come along, white or black,

82

1   that out ranks them and scores better than

2   they do on the next exam, correct?

3       A.    Correct.

4           MR. GOTTESMAN:  So we're done I

5   believe.  Counsel, have you instructed your

6   client on the benefits of signature because I

7   will be ordering this transcript?

8           MR. HICKS:  Yes.  We would like

9   the right to review the transcript.

10          THE WITNESS:  Okay.                          03:26

11

12

13          _____

14          LT. COL. THERESA THEETGE

15

16

17              *  *  *

18      (DEPOSITION CONCLUDED AT 3:26 p.m.)

19              *  *  *

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

STATE   OF   OHIO
3              :  SS
COUNTY OF CLERMONT

4

5          I, Deanne Cartwright, the undersigned,
a duly qualified notary public within and for
6  the State of Ohio, do hereby certify that
LT. COL. THERESA THEETGE was by me first duly
7  sworn to depose the truth and nothing but the
truth; foregoing is the deposition given at
8  said time and place by said witness;
deposition was taken pursuant to stipulations
9  hereinbefore set forth; deposition was taken
by me in stenotype and transcribed by me by
10  means of computer; that the transcribed
deposition was submitted to the witness for
11  examination and signature and that signature
may be affixed out of the presence of the
12  Notary Public-Court Reporter. I am neither a
relative of any of the parties or any of
13  their counsel; I am not, nor is the court
reporting firm with which I am affiliated,
14  under a contract as defined in Civil Rule
28(D) and have no financial interest in the
15  result of this action.

16          IN WITNESS WHEREOF, I have hereunto set
my hand and official seal of office at
17  Cincinnati, Ohio this 25th day of October,
2021.

18

19                              _Deanne Cartwright_

20  My commission expires:  Deanne Cartwright
August 5, 2023    Notary Public, State of Ohio

21

22

23

24

25